UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

LEE ROBBINS,

Plaintiff, 5:06-CV-0051 (GTS/GJD)

v.

NEW YORK STATE ELECTRIC AND GAS CORP.,

Defendant.

---

APPEARANCES: OF COUNSEL:

LAMA LAW FIRM
Counsel for Plaintiff
2343 N. Triphammer Road
Ithaca, NY 14850

LUCIANO L. LAMA, ESQ.

HINMAN HOWARD & KATTEL LLP
Counsel for Defendant
80 Exchange Street
700 Security Mutual Building
Binghamton, NY 13902-5250

LESLIE PRECHTL GUY, ESQ.

HON. GLENN T. SUDDABY, United States District Judge

**DECISION and ORDER**

Currently before the Court in this employee benefits action filed by Lee Robbins ("Plaintiff") is a second motion for summary judgment filed by New York State Electric and Gas Corporation ("Defendant" or "NYSEG"). (Dkt. No. 34.) For the reasons set forth below, Defendant's motion is granted and Plaintiff's Complaint is dismissed.

## I. BACKGROUND

### A. Plaintiff's Claims

Generally, Plaintiff's Complaint alleges that, after his employment was terminated on April 7, 2004, Defendant violated his rights, pursuant to the Employee Retirement Income Security Act ("ERISA") and New York State Labor Law, by (1) "refus[ing] and or fail[ing] to provide [P]laintiff with a summary plan description," detailing information "regarding [Plaintiff's] retirement benefits, health insurance, or any information regarding the [employee benefit] plan," (2) failing "to provide health insurance to [P]laintiff upon his departure from employment from NYSEG," in violation of the company's employee benefits plan, (3) "fail[ing] to provide the notice [of termination]" within five days of the termination of his employment relationship with NYSEG, (4) "fail[ing] and refus[ing] to provide Plaintiff with notification of his right to continue [his medical and health insurance] coverage, and (5) "breach[ing] its [fiduciary] duties owed to Plaintiff . . . by failing to (a) pay insurance premiums on behalf of Plaintiff, or provide medical coverage as required by the Plan, (b) advise Plaintiff at the time of his discharge that it was not going to pay his insurance premiums or provide him with medical coverage, and (c) determine whether Plaintiff would have the ability to obtain continued health insurance coverage in accordance with the employee benefits plan upon his termination from NYSEG.[1] (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Familiarity with the factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id*.)

---

[1] Plaintiff's Complaint also asserted claims for negligent and intentional infliction of emotional distress. (Dkt. No. 1.) However, on September 4, 2007, Chief Judge Norman A. Mordue issued a Decision and Order dismissing those claims. (Dkt. No. 21.)

**B. Material Facts**

The following material facts are undisputed by the parties. (*Compare* Dkt. No. 34, Attachment 25 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 36 [Plf.'s Rule 7.1 Response].)

Defendant is a public utility company that supplies electricity and natural gas in communities across upstate New York. Defendant's production and clerical employees are represented by the International Brotherhood of Electrical Workers Union ("Union"). During the time in question, Plaintiff was a member of the Union.

Defendant's summary plan description for bargaining unit employees is the "Hourly Employees Benefits Handbook" (the "Handbook").[2] At the time the current action ensued, Plaintiff was (and apparently still is) in possession of the 2002 version of the Handbook.[3]

Information about Defendant's cash balance benefit plan is set forth in pages 122 to 127 of the Handbook. More specifically, on page 125, the Handbook states "that the employee must file for benefits in writing at least 90 days before the date the employee wants to start receiving pension benefits."

In late November or early December 2003, Plaintiff made a verbal request for his pension calculation to his Union steward Jim Clynes. In response, Mr. Clynes gave Plaintiff an "800" number to call. However, Plaintiff never called that number.[4]

---

[2] The Court recognizes that, in his Rule 7.1 Response, Plaintiff denied this factual assertion. However, in so doing, Plaintiff failed to provide a record citation in support of his denial, as required by Local Rule 7.1(a)(3). *See* N.D.N.Y.L.R. 7.1(a)(3). As a result, and in accordance with Local Rule 7.1(a)(3), the Court deems this fact admitted.

[3] The Court acknowledges that the parties dispute whether Plaintiff comprehends all of the terms set forth in the Handbook.

[4] According to Plaintiff, he never called the number because the number was not "an appropriate number to call, as it was the same number he had been given to call for

Sometime in 2003, Plaintiff spoke to someone in Human Resources about the calculation of his benefits. However, Plaintiff never put his request for a calculation in writing in 2003.[5]

On April 7, 2004, Plaintiff, who was employed by Defendant for nearly thirty-five (35) years, was terminated. In May of 2004, Plaintiff received a letter dated May 5, 2004, from Jay Shapiro, which confirmed his termination of employment with Defendant. Enclosed in the letter was a Termination Information Booklet for Union employees. The termination booklet contained information about healthcare coverage and the pension plan.[6]

Around the same time, Plaintiff received another letter from Jay Shapiro, dated May 5, 2004, regarding his retirement benefits. This letter provided additional information about the cash balance option and the annuity options available to Plaintiff, and provided Plaintiff with the estimated dollar amounts for each option.[7] More specifically, the enrollment form for the retirement benefit plan showed the figure for Plaintiff for a straight life annuity of $1,168.92 per month, the figure for a ten-year period, certain and continuous annuity, of $1,143.20 per month,

---

discrimination claims." (Dkt. No. 36, at ¶ 14.) According to Defendant, this "800" number was different from the latter number. (Dkt. No. 34, Attachment 25, at ¶ 15.)

5 According to Defendant, Plaintiff never again asked for a calculation after he spoke with someone in Human Resources. (Dkt. No. 34, Attachment 25, at ¶¶ 17, 18.) According to Plaintiff, there may have been other times after he spoke to someone in Human Resources when he requested a calculation of his benefits; but he is uncertain of that fact. (Dkt. No. 36, at ¶ 18.)

6 According to Plaintiff, the information about his pension plan was not sufficient to enable him to determine what his pension would be.

7 According to Plaintiff, the letter failed to provide any explanation regarding how the stated option amounts were determined.

and the figure for a lump sum benefit payment at that time (May 2004) of $253,840.18.[8]

The letter also contained the retirement benefit election form. Plaintiff reviewed pages 3, 4, 5 and 7 of the election form, signed the form on page 5, and dated his signature August 5, 2004. Plaintiff submitted the form to Defendant in mid-September of 2004. Under paragraph A, entitled "retirement benefit choice," Plaintiff drew a box around "cash balance" option and initialed that box.[9]

Plaintiff elected to roll over 100% of his lump sum distribution into an IRA account. Plaintiff understood that, if he took the cash balance and was reinstated,[10] he would have to pay it back.

On June 2, 2004, Plaintiff signed his COBRA election forms,[11] which he received sometime after his termination. Plaintiff received COBRA medical coverage effective as of the date of his termination.

In late August 2004, Jay Shapiro called Plaintiff and said "he did not think a man of [his] age would want to take the cash balance," and therefore offered Plaintiff the option of retiring as of that date in August or early September, with full benefits, as if Plaintiff had retired that day.

---

[8] The parties dispute whether the benefit plan that Plaintiff reviewed was the Summary Plan Description ("SPD"). (*Compare* Dkt. No. 34, Attachment 25, at ¶ 26 *with* Dkt. No. 36, at ¶ 26.) In addition, according to Plaintiff, despite reading the benefit plan, and initialing the "cash balance" option in the form, he did not comprehend the information set forth in the benefit plan.

[9] When Plaintiff initialed the box containing the lump sum estimate, he recognized that the amount Defendant had calculated to give him for his cash balance was $253,840.18.

[10] The Union had begun the process of contesting Plaintiff's termination, which was ultimately to be decided by an arbitration panel.

[11] COBRA stands for Consolidated Omnibus Budget Reconciliation Act.

Jay Shapiro also stated that he would "throw in a little something to sweeten the deal."

Plaintiff did not ask Jay Shapiro what amount he meant to "sweeten the deal" because he was going to take the cash balance anyway, despite the fact that he understood that doing so was to his financial detriment.[12]

On November 22, 2004, Union Attorney Catherine Creighton sent Plaintiff's attorney Luciano Lama a letter, which indicated that Defendant was offering Plaintiff the option of retirement in exchange for settlement of the arbitration. The letter explained that, if Plaintiff lost the arbitration and remained discharged, his pension would be lower than if he retired. More specifically, the letter explained that, if Plaintiff accepted Defendant's offer to retire, his pension would include a NYSEG early retirement supplement and would be $30,400.00 per year, but if he did not accept Defendant's offer, and lost the arbitration, he would retire as a discharged employee, and his pension would be only $14,869.00 per year.[13] Despite Defendant's offer, Plaintiff did not engage in settlement negotiations with Defendant over the labor arbitration.

In January 2005, Defendant offered to have Plaintiff return to work provided he signed a last chance agreement. However, Plaintiff did not return to work in January 2005.[14] On January 24, 2005 and February 7, 2005, Catherine Creighton sent letters to Plaintiff's Attorney regarding Plaintiff's reinstatement.

---

[12] The cash balance was less than the annuity.

[13] Plaintiff personally reviewed this letter the week of November 22, 2004.

[14] According to Plaintiff, he did not return to work because the offer was a "sham," in that management had, by that time, held a meeting telling approximately 200 of Plaintiff's coworkers that he was "dangerous," and that if any of them saw Plaintiff on Defendant's premises, they should notify management immediately. Further, Plaintiff believed that, because the offer was a "last chance" offer, his supervisor would just fire him again.

On February 8, 2005, attorney Creighton sent Plaintiff's attorney another letter, which Plaintiff saw shortly thereafter. This letter explained the financial benefit to Plaintiff returning to work, if even for one day. Defendant subsequently offered to reinstate Plaintiff again beginning February 14, 2005.[15]

Plaintiff then spoke with attorney Creighton, who told him that he could go back to work under Defendant's reinstatement offer, work one day, and retire. However, Plaintiff did not believe Attorney Creighton because, according to Plaintiff, company rules stated that, in order to retire, an employee must give Defendant ninety (90) days notice of retirement.

Plaintiff did not return to work on February 14, 2005, because he believed it was a hostile environment. On or about March 21, 2005, attorney Creighton sent Plaintiff's attorney another letter, which explained that Defendant may have held off on issuing Plaintiff his cash balance lump sum because of the reinstatement offer, and reminded Plaintiff's attorney of her earlier recommendation that Plaintiff not take the lump sum but accept the offer to retire and double his benefits. The letter further explained that the arbitration would not result in reinstatement because of Plaintiff's refusal to accept reinstatement in January and February. Finally, the letter explained that Defendant would still agree to offer Plaintiff retiree medical benefits if he agreed to settle the arbitration.

In April or May 2005, Plaintiff received the lump sum payment. His lump sum payment was almost $14,000.00 higher than the estimate he agreed to accept.

Plaintiff's medical care is currently covered under Defendant's MVP plan, which he received as soon as COBRA ran out. Plaintiff never had to pay anything out of pocket for

---

15 According to Plaintiff, this offer was also a "sham."

medical services subsequent to his termination because Plaintiff had continuous coverage under COBRA and then retiree medical benefits.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id.*)

**C. Defendant's Motion**

Generally, in support of its motion for summary judgment, Defendant argues as follows: (1) Defendant supplied Plaintiff with the necessary information to comply with ERISA requirements and to allow Plaintiff to make informed choices about post-termination benefits; (2) to the extent Plaintiff is alleging a claim under 29 U.S.C. § 1132(c), such a claim fails because Plaintiff made no written request for information under 29 U.S.C. § 1025(a); (3) in the alternative, Plaintiff's claim under 29 U.S.C. § 1132(c) should be dismissed because Plaintiff suffered no damages as a result of an alleged lack of information; (4) Plaintiff's New York State Labor Law claim should be dismissed because he suffered no damages as a result of alleged lack of information; and (5) Plaintiff's breach of fiduciary duty claim should be dismissed because Defendant had no duty to pay health insurance premiums for a terminated employee. (*See generally* Dkt. No. 35, Attachment 26 [Def.'s Memo. of Law].)

Generally, in Plaintiff's response to Defendant's motion for summary judgment, he argues as follows: (1) he was "constructively retired" on February 14, 2005, and was therefore entitled to "all pay and benefits up to that date, and all ERISA retirement benefits, including health insurance, from February 14 forward"; (2) Defendant violated ERISA's disclosure

requirements by failing to "furnish a summary plan description" that complies with the statutory requirements of ERISA; (3) Defendant was a fiduciary for Plaintiff's medical benefits plan who breached its fiduciary duty by wrongfully terminating Plaintiff, resulting in Plaintiff having to pay over $7,000 for COBRA and $8,000 for his dental care; and (4) Defendant violated New York State Labor Law by providing him with a notice of termination more than five working days after the date of his termination. (*See generally* Dkt. No. 39 [Plf.'s Reply Memo. of Law].)

Generally, in its reply, Defendant argues as follows: (1) Plaintiff's termination claims were previously dismissed, and therefore Plaintiff should not be permitted to re-litigate matters related to the termination itself or events leading up to it; and (2) the "procedural failures" that Plaintiff discusses in his memorandum of law are inaccurate and irrelevant. (*See generally* Dkt. No. 42 [Def.'s Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's recent decision in *Pitts v. Onondaga County Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

Because this decision is intended primarily for review by the parties, the Court will not recite, in their entirety, the legal standards governing Plaintiff's claims in this Decision and Order, but will instead refer to the relevant legal standards in its analysis only where necessary.

## III. ANALYSIS

### A. Plaintiff's Claim Under ERISA

As stated above in Part I.C. of this Decision and Order, Defendant seeks the dismissal of Plaintiff's ERISA claims for the following reasons: (1) Defendant supplied Plaintiff with the necessary information to comply with ERISA requirements and to allow Plaintiff to make informed choices about post-termination benefits; (2) Plaintiff's claim under 29 U.S.C. § 1132(c) cannot survive summary judgment because (a) Plaintiff made no written request for information under 29 U.S.C. § 1025(a), and (b) Plaintiff suffered no damages as a result of alleged lack of information; and (3) Plaintiff's breach of fiduciary duty claim cannot survive summary judgment because Defendant had no duty to pay health insurance premiums for a terminated employee.

#### 1. Whether Defendant Violated ERISA by Failing to Provide Plaintiff with a Summary Plan Description

Based on the current record, the Court accepts Defendant's argument that it provided Plaintiff with a SPD, and therefore did not violate ERISA. As an initial matter, the Court finds, after reviewing the Handbook, that it satisfies the requirements of a SPD. (*See* Dkt. No. 42, Attachments 2-5.)[16] Moreover, it is undisputed that Plaintiff received a copy of the Handbook

---

[16] ERISA and its corresponding regulations do not separately define the term "summary plan description," but instead set out with great specificity how the SPD must be written and what information it must contain. For example, 29 U.S.C. § 1022, which pertains to summary plan descriptions, provides as follows:

> (a) A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title. The summary plan description shall include the information described in subsection (b) of this section, shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.
>
> (b) The summary plan description shall contain the following information: The name and type of administration of the plan; . . . the name and address of the person designated as agent for the service of legal process, if such person is not the administrator; the name and address of the administrator; names, titles, and addresses of any trustee or trustees (if they are persons different from the administrator); . . . the plan's requirements respecting eligibility for participation and benefits; . . . circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; the source of financing of the plan and the identity of any organization through which benefits are provided; the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis; the procedures to be followed in presenting claims for benefits under the plan including the office at the Department of Labor through which participants and beneficiaries may seek assistance or information regarding their rights under this chapter and the Health Insurance Portability and Accountability Act of 1996 with respect to health benefits that are offered through a group health plan (as defined in section 1191b(a)(1) of this title) and the remedies available under the plan for the redress of claims which are denied in whole or in part (including procedures required under section 1133 of this title).

29 U.S.C. § 1022. Section 1133, referred to above, requires as follows:

> In accordance with regulations of the Secretary, every employee benefit plan shall–
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for

from Human Resources every contract year up to and including 2002.[17] Granted, Plaintiff argues that (1) he did not receive a Handbook after 2002, (2) the 2004 Handbook "would have been controlling of his retirement benefits, and (3) Defendant is therefore liable for violating ERISA. However, the Court rejects this argument for four reasons.

First, Plaintiff has failed to introduce any record evidence that would establish either (1) that a "2004 Handbook" existed, or (2) that any such 2004 Handbook was materially different from the 2002 Handbook. Second, even if the Court were to assume that a 2004 Handbook existed, "ERISA § 104(b)(1) [only] requires a plan administrator to provide every participant with an updated SPD every five years unless no amendments have been made to the plan during that time." *Levin v. Raynor*, 03-CV-4697, 2004 WL 2937825, at *10 (S.D.N.Y. Dec. 17, 2004) (citing 29 U.S.C. § 1024[b][1]); *see also Campanella v. Mason Tenders' Dist. Council Pension Plan*, 299 F. Supp.2d 274, 292 (S.D.N.Y. 2004). Third, even assuming that Defendant somehow violated § 104(b)(1) by failing to provide Plaintiff with an updated SPD,[18] "[t]he imposition of

---

> benefits has been denied for a full and fair review by the appropriate fiduciary of the decision denying the claim.

29 U.S.C. § 1133. ERISA's regulations add that summary plan descriptions "will usually require the limitation or elimination of technical jargon and of long, complex sentences, the use of clarifying examples and illustrations, the use of clear cross references and a table of contents." 29 C.F.R. § 2520.102-2.

[17] "An administrator of an ERISA benefit plan has a duty to provide participants with certain information about the plan." 29 U.S.C. § 1021(a)." *Simeon v. Mount Sinai Medical Center*, 150 F. Supp.2d 598, 602 (S.D.N.Y. 2001). Specifically, "[t]he administrator shall furnish to each participant . . . a copy of the summary plan description ["SPD"] . . . within 90 days after he becomes a participant. . . ." 29 U.S.C. § 1024(b)(1).

[18] The Court notes that the Handbook is also available, with updates, to employees on Defendant's intranet system, which Plaintiff had access to.

penalties for violating § 104(b)(1) is left to the discretion of the district court"[19]; and, after considering the relevant factors, the Court declines to impose any penalties on Defendant given that there is no evidence (1) of bad faith, (2) that Plaintiff ever made any requests that were ignored, or (3) that Plaintiff suffered any prejudice as a result of not receiving an updated Handbook. Finally, to the extent that Plaintiff alleges that the administrator failed to inform Plaintiff of some requirement, the Court finds that Plaintiff had knowledge of his requirements under the SPD based on his receipt of Handbooks every year prior to and including 2002.[20]

For all of these reasons, Plaintiff's claim that Defendant violated ERISA by failing to provide him with a SPD is dismissed.

**2. Whether Defendant Violated ERISA by Failing to Provide Plaintiff with Health Insurance**

Based on the current record, the Court accepts Defendant's argument that it did not violate ERISA by failing to provide Plaintiff with health insurance. As an initial matter, it is undisputed that, from the time Plaintiff was terminated on April 7, 2004, until the time the current action was commenced, Plaintiff never experienced a gap in medical coverage.[21] In

---

[19] *Levin*, 2004 WL 2937825, at *10 (noting that a district court relies on the following factors in deciding whether to impose penalties for a violation of § 104(b)(1): "1) the administrator's bad faith or intentional conduct; 2) the length of the delay; 3) the number of requests made; 4) the extent and importance of the documents withheld; and 5) the existence of any prejudice to the participant or beneficiary") (citations omitted).

[20] "[E]ven where an administrator fails to inform a participant of a requirement through a summary plan description, the administrator may avoid liability by showing that any error was harmless, e.g., by showing that the employee had actual knowledge of the requirement." *Weinreb v. Hospital for Joint Diseases Orthopaedic Institute*, 285 F. Supp.2d 382, 387 (S.D.N.Y. 2003) (citing *Burke v. Kodak Retirement Income Plan*, 336 F.3d 103, 113-14 [2d Cir. 2003]).

[21] Plaintiff received COBRA medical coverage effective as of the date of his termination, and Plaintiff began receiving (and apparently continues to receive) medical

addition, it is undisputed that Plaintiff never had to pay out of pocket for medical services because of any gap in medical coverage after his discharge. Therefore, Plaintiff's only expense related to his health insurance was the money that Plaintiff was forced to pay for COBRA.[22]

"COBRA provides that employers must allow former employees to continue health care coverage under the employer's plan if a qualifying event occurs." *Goodman v. Commercial Labor Servs., Inc.*, 98-CV-1816, 2000 WL 151997, at *2 (N.D.N.Y. Feb. 11, 2000) (Hurd, J.) (citing 29 U.S.C. § 1161); *see also Messer v. Bd. of Educ. of City of New York*, 01-CV-6129, 2007 WL 136027, at *20 (E.D.N.Y. Jan. 16, 2007). "Termination of employment is considered a qualifying event." *Goodman*, 2000 WL 151997, at *2 (citing § 1163[2]). "When a covered employee is terminated, the employer must notify the group health plan administrator within [thirty] days of the termination." *Id.* (citing § 1166[a][1]). "The plan administrator must then notify the discharged employee and other qualified beneficiaries of their COBRA rights within [fourteen] days of the date that the administrator was notified of the qualifying event." *Id.* (citing § 1166[c]).

---

coverage under Defendant's MVP plan as soon as COBRA ran out.

[22] In his memorandum of law in opposition to Defendant's motion for summary judgment, Plaintiff argues that he was "constructively retired" on February 14, 2005, and that he is therefore "due all pay and benefits up to that date, and all ERISA retirement benefits, including health insurance from February 14 forward." (Dkt. No. 39.) As an initial matter, it is undisputed that Defendant *offered* Plaintiff the *option* of returning to work on February 14, 2005, but that Plaintiff declined the offer. As a result, the Court rejects Plaintiff's argument that he was "constructively retired" on February 14, 2005. Having said that, Plaintiff's claims related to his termination were previously dismissed by the Court. (*See* Dkt. No. 21) In addition, it is undisputed that Plaintiff received a lump sum retirement benefit subsequent to February 14, 2005, and that Plaintiff had health insurance coverage from the date of his termination through the date the instant action was commenced. Therefore, to the extent that Plaintiff is arguing that, in addition to failing to pay/reimburse him for his COBRA expenses, Defendant failed to provide him with certain ERISA retirement benefits, such an argument is without merit.

"Under COBRA, the plan administrator must allow the discharged employee and other qualified beneficiaries sixty (60) days from the date on which coverage ends under the plan, or 60 days from the date notice was given to decide whether or not to elect continuation of their group health plan coverage." *Id*. (citing § 1165[1]). "In addition, payment of the first premium is not due until 45 days after the date when election of continuation of coverage is made." *Id*. (citing § 1162[3]. "COBRA notices provided by the plan administrator must be sufficient to enable the discharged employee to make an informed and intelligent decision whether to elect continuation coverage." *Id*. (citations omitted). "A plan administrator's failure to comply with COBRA's notice requirements may entitle a beneficiary to statutory damages of up to $100 per day, attorney's fees and costs, and medical damages." *Messer*, 2007 WL 136027, at *20 (citing 29 U.S.C. § 1132[c][1]).

Having said that, the general rule is that terminated employees are required to pay their own COBRA premiums.[23] In addition, there is no language in the Handbook to suggest that

---

[23] *See, e.g., Local 217, Hotel & Rest. Empl. Union v. MHM,* 976 F.2d 805, 809 (2d Cir. 1992) ("Upon the happening of a qualifying event, such as layoffs, an employer must notify the plan administrator of the occurrence of that event. . . . The administrator must then notify the qualified beneficiaries of their rights under COBRA within fourteen days of the date on which the administrator is notified. . . . The qualified beneficiary may elect continuation coverage within sixty days of the qualifying event or of notice of the qualifying event, whichever is later. . . . Premiums are to be paid by the employee."); *Chesney v. Valley Stream Union Free Sch. Dist. No. 24*, 05-CV-5106, 2009 WL 936602, at *4 (E.D.N.Y. Mar. 31, 2009) ("COBRA simply requires that employers notify outgoing employees of their right to elect COBRA coverage; it does not obligate employers to pay premiums for any coverage that an employee elects. Terminated and otherwise departing employees must pay their own premiums."); *De Nicola v. Adelphi Acad.*, 05-CV-4231, 2006 WL 2844384, at *3 (E.D.N.Y. Sept. 29, 2006) ("COBRA simply requires that employers notify outgoing employees of their right to elect COBRA coverage; it does not obligate employers to pay premiums for any coverage that an employee elects. . . . Rather, departing employees must pay their own premiums."); *LaFauci v. St. John's Riverside Hosp.*, 381 F. Supp.2d 329, 332 (S.D.N.Y. 2005) ("The health care plan administrator is, in turn, required to notify the qualified beneficiaries of their right under COBRA to elect

Defendant agreed to pay and/or reimburse a terminated employee for COBRA expenses. As a result, the Court rejects Plaintiff's argument that Defendant violated ERISA by not paying Plaintiff's COBRA premiums. In addition, Plaintiff has not alleged (or introduced any evidence to establish) that his COBRA notice was insufficient.

For all of these reasons, Plaintiff's claim that Defendant violated ERISA by failing to provide him with health insurance is dismissed.

**3. Whether Defendant Was a Fiduciary for Plaintiff's Medical Benefits Plan, Which Breached Its Fiduciary Duty**

Based on the current record, the Court accepts Defendant's argument that Defendant is not liable for breach of fiduciary duty for two reasons. First, Plaintiff has failed to introduce any evidence establishing that Defendant was a medical benefit plan fiduciary, and "[o]nly the employee plan and the plan fiduciaries may be held liable for an ERISA claim to recover benefits allegedly due." *Matthews v. Duggal Color Projects, Inc.*, 94-CV-1140, 1997 WL 328076, at *1 (S.D.N.Y. June 16, 1997) (granting defendant's motion for summary judgment where plaintiff "failed to bring her claims against the plan itself" because defendant was "not a 'fiduciary' with respect to th[e] plan" given that there was no evidence that "defendant had any discretionary authority or responsibility over the plan or in any other respect acted as a fiduciary with respect to the plan") (citations omitted).

Second, even assuming for the sake of argument that Defendant was a medical benefit plan fiduciary, Plaintiff has failed to introduce any evidence establishing that Defendant breached a fiduciary duty that it owed to Plaintiff. Instead, Plaintiff merely argues that (1)

---

continuation coverage. COBRA coverage lasts for a maximum of 18 months. The employee must pay for the coverage himself.").

Defendant "breached its fiduciary duty . . . by forcing [Plaintiff] into retirement through wrongful termination, then reinstatement, and a mock offer to return to work," and (2) "[t]hrough this process, [Plaintiff] lost his health care coverage through the NYSEG plan, and was forced to pay over (a) $7,000.00 for COBRA, a lesser coverage[,]" and (b) "$8,000.00 for his dental care." (Dkt. No. 39.)

As an initial matter, Plaintiff has failed to introduce any evidence establishing that COBRA was a lesser coverage. In addition, as stated in Part III.A.2 of this Decision and Order, Defendant did not owe Plaintiff a fiduciary duty to pay and/or reimburse him for his COBRA expenses. Finally, Plaintiff has failed to introduce any evidence that dental care was an option for NYSEG retirees. For all of these reasons, Plaintiff has failed to establish that he did not receive medical benefits allegedly due.

As a result, Plaintiff's breach of fiduciary duty claim under ERISA is dismissed.

**B. Plaintiff's Claim Under New York State Labor Law**

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's claim under New York State Labor Law because Plaintiff suffered no damages as a result of Defendant's alleged failure to provide certain post-termination information within the required statutory time period.

Because the Court has already denied Plaintiff's ERISA claims, the Court declines to extend pendent jurisdiction over this claim.[24] As a result, Plaintiff's state law claims are

---

[24] "Where a district court has dismissed all claims over which it has original jurisdiction, the court may decline to exercise jurisdiction over state law claims." *Hurley v. County of Yates*, 04-CV-6561, 2005 WL 2133603, at *3 (W.D.N.Y. Aug. 31, 2005) (citing 28 U.S.C. § 1367[c][3]), *accord Middleton v. Falk*, 06-CV-1461, 2009 WL 666397, at *9 (N.D.N.Y.

dismissed without prejudice.

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 34) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's claim under New York State Labor Law is **DISMISSED without prejudice** to refiling in New York State Court within **THIRTY (30) DAYS** of this Order, pursuant to 28 U.S.C. § 1367(d); and it is further

**ORDERED** that the remainder of Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED with prejudice**.

Dated: March 19, 2010
Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

---

Mar. 10, 2009) (Suddaby, J. adopting Homer, M.J.); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (citations omitted) ("[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if . . . not present a federal court should hesitate to exercise jurisdiction over state claims.").